# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No: 24-CR-130-JFH-1** |
| | ) | |
| **JOSHUA LEE BOLIN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT JOSHUA LEE BOLIN'S SENTENCING MEMORANDUM**

COMES NOW, the Defendant herein, Joshua Lee Bolin (hereinafter "Mr. Bolin"), by and through her attorney of record, Carla R. Stinnett, and respectfully submits this *Sentencing Memorandum* to assist the Court in determining a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing under 18 U.S.C. § 3553(a), *United States v. Booker*, 543 U.S. 220 (2005). Mr. Bolin has accepted responsibility, entered a timely guilty plea, and is fully prepared to accept the Court's judgment. For the reasons below, Mr. Bolin respectfully moves the Court for a sentence of sixty (60) months[1](with credit for time served), followed by a term of supervised release the Court believes is appropriate. For the reasons stated herein, the requested sentence is sufficient, but not greater than necessary, to serve the purposes of punishment. In support of this sentence request, Mr. Bolin alleges and states as follows:

## I. LEGAL STANDARD.

Following *Booker*, the Court must impose sentence in accordance with 18 U.S.C. §3553(a). In particular, the Court must fashion a sentence "sufficient, but not greater than necessary" to

[1] If the objection to the PSR is sustained, this is the requested sentence. If it is not, the requested sentence is 63 months, the lowest guideline sentence.

comply with the purposes of punishment set forth in 18 U.S.C. §3553(a)(2). *Id.*; *see, e.g., Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011) (sentencing in accordance with "sufficient, but not greater than necessary" mandate is court's "overarching duty"); *Kimbrough v. United States*, 552 U.S. 85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the "overreaching instruction" of §3553(a)).

**II. <u>HISTORY AND CHARACTERISTICS OF JOSHUA LEE BOLIN.</u>**

The §3553(a) factors require the Court to sentence the person who stands before it, not simply the offense reflected in the judgment. Joshua Bolin is now twenty-seven years old. The conduct that brought him before this Court is serious, and nothing in this section is intended to minimize it. But neither should that conduct erase the life that preceded it or the person known by his family, friends, teachers, pastors, employers, teammates, and members of his community. The remarkable number of people who have written on Mr. Bolin's behalf and the consistency of what they say about him, provides the Court with a broader picture of the person it is sentencing.



*A. Josh was raised in a stable, loving family that remains firmly beside him.*

Josh was born on October 30, 1998, in Muskogee, Oklahoma, and spent nearly his entire life in Sallisaw. He was raised by Jonathan and Pamela Bolin, who have been married for approximately thirty years. By every account, his childhood was stable and supportive. He reports

no history of abuse or neglect, no parental substance abuse, and no instability in the home. He remains extraordinarily close to his parents, speaking with them daily (even while incarcerated), and likewise maintains close, frequent contact with his two sisters. There is nothing dramatic about that history, and that is precisely the point. Josh did not grow up without people who cared for him. He was not raised without structure, expectations, faith, or examples of hard work. His family provided those things. His grandmother[2] describes a family in which honesty, hard work, family, law-abiding behavior, Christianity, kindness, and respect were deliberately taught and reinforced across generations. She remains committed to standing beside Josh while also expecting him to learn from his mistakes and make better choices. His aunt similarly describes him as having been raised in church and taught from a young age the importance of faith, integrity, respect, accountability, and kindness.

His mother, Pamela, provides perhaps the most complete account of the child and young man Josh was before this case. She describes him as the youngest of three children, a gentle and compassionate child who was devoted to his family and particularly close to his grandparents. She recalls that even as a young boy, Josh was inclined to help others without seeking recognition for doing so. As he grew older, those traits manifested themselves in his involvement in FFA and community service, his friendships, his work, his church, and his family relationships.

That description is significant because it does not come only from Josh's family. People who have known the Bolins for years repeatedly describe a close family with strong values. One longtime friend writes that Josh "comes from a fantastic family" and that kindness, loyalty, integrity, and joy are values embodied by the family as a whole. Another, who has known Josh

[2] All character letters referenced herein and additional letters are attached at Exhibit "A."

and his family for more than a decade, describes the entire family as kind and welcoming and Josh as a product of that environment.

The importance of this family history is not that a good family somehow immunizes a person from making a serious mistake. It plainly does not. Its importance at sentencing is prospective. Josh has a loving family where he will return. He has parents, siblings, extended family, and lifelong family friends who have not abandoned him and who will expect something of him when this case is over. That is a resource many defendants simply do not have.



*B. The person described in the character letters is remarkably consistent across time and relationships.*

The Court has received a large collection of letters on Josh's behalf. What makes those letters meaningful is not merely their number, but their sources. They come from people who knew Josh as a child, classmates who grew up with him, longtime family friends, teammates, coaches, parents of children he coached, members of his church, pastors, employers, community members, and family. Some have known him for only several years; others have known him for most or all of his life. And yet, the descriptions are strikingly consistent. Again and again, the writers use the same words: kind, generous, respectful, dependable, hardworking, compassionate, humble, loyal, and giving.

A retired educator who knew Josh first as a young student and later as an adult friend describes him as "exceptionally intelligent, kind-hearted, respectful, and hardworking," and recalls that even as a child he was polite, thoughtful, and sweet-natured. Those qualities, she writes, continued into adulthood. A softball teammate who has known him for approximately ten years describes the same traits in a very different setting: even in competitive circumstances, Josh remained calm, patient, respectful, and supportive of others. Others who have known him for ten, fifteen, twenty, or even twenty-five years offer substantially the same account. Wesley Sevenstar, who has known Josh for fifteen years, describes a consistent willingness to help strangers, friends, and family without expecting anything in return. Dennis Fletcher, the Mayor of Vian, has known Josh for approximately twenty-three years and describes him as honest, kind, compassionate, responsible, and someone who has always been willing to help others and give back to his community. These are not people who encountered Josh only after this case began. They knew him before there was any reason to write a letter for a federal judge. Their descriptions therefore provide a useful longitudinal view of his character.

The letters also contain something more persuasive than adjectives—examples**.** Cassie Wedge recalls being with Josh when he noticed a stranger who appeared to need a haircut. Josh walked over to the man, hugged him, spoke with him, and paid for his haircut. It was not done for an audience or recognition; it was simply something he saw that he could do for another person. Melinda Mink remembers an incident when Josh was still a teenager. A man ahead of them at a store did not have enough money to complete his purchase. Josh did not have much money himself but quietly took money from his pocket and paid the difference. Ms. Mink writes that Josh did not even see her watching him do it. Those small moments matter because they occurred when Josh had nothing to gain from them. They are consistent with the broader picture painted by dozens of



people. Josh Bolin notices people, likes people, and when he sees someone who needs help, his instinct is to help.

*C. Josh's life has been rooted in family, community, sports, work, and faith.*

Josh's roots in eastern Oklahoma run deep. Except for relatively short periods in Stillwater and Wilburton, he has lived his entire life in Sallisaw. His relationships are similarly rooted. Many of the people supporting him have known him since childhood or high school, and some of the relationships span multiple generations of the same families.

Sports have been a significant part of that life. Josh grew up around baseball and softball, participated in FFA, and later coached and volunteered. The letters describe someone who did more than enjoy sports himself; he used them as a means of connecting with and helping others. A former teacher who worked alongside him at Sallisaw Middle School and in Special Olympics describes his enthusiasm for working with children and recalls Josh helping coach her son's T-ball team even though the children were only five years old and Josh understood that his role was as much about encouragement and development as competition. His mother similarly recalls that FFA became an important part of Josh's high-school years and helped develop qualities of service, integrity, respect, and responsibility. After graduating, Josh continued volunteering through church and other community activities.

Faith has also been a longstanding part of Josh's life rather than something adopted in anticipation of sentencing. He was raised in church, has participated actively in church life, and has served in worship ministry. Multiple unrelated writers identify his Christian faith as central to the person they have known. His former teacher likewise identifies his faith as an important and longstanding part of his life. More recently, that faith community has become an important source of accountability and support. Prior to incarceration, Josh met regularly with his pastor, and his pastors remain among those willing to support him while acknowledging the seriousness of the circumstances before the Court. His lead pastor writes that Josh has acknowledged the brokenness his actions caused to himself and others, expressed remorse, and sought to carry that responsibility rather than minimize it. That distinction matters. The defense does not ask the Court to value support that consists of people telling Josh he did nothing wrong. The more meaningful support is the kind reflected in the letters by people who love him, understand that this case is serious, expect accountability, and nevertheless intend to remain in his life.




*D. Josh has pursued education, maintained employment, and demonstrated the capacity to live a productive life.*

Josh's history also reflects educational and vocational ability. He earned an Associate of Applied Science degree from Eastern Oklahoma State College in 2019. He later attended Oklahoma State University and Northeastern State University and came within approximately one semester of completing a bachelor's degree in Agricultural Leadership. That educational history is consistent with the descriptions of Josh as intelligent and capable. His former teacher remembers

him as exceptionally intelligent even as a young student. His interests in FFA and agricultural leadership also show continuity between his education and the activities that occupied much of his adolescence and early adulthood.

Josh has likewise worked. At the time of his arrest, he was employed by his father's business, Sunshine Window Cleaning, earning approximately $2,500 per month, and he also performed work for Ostrander Enterprises in Arkansas. The letters from those who have observed him in work and volunteer settings repeatedly describe him as hardworking, dependable, responsible, and willing to do what is asked of him. These are not extraordinary accomplishments. They are evidence of something more basic but important. Josh has demonstrated that he possesses the skills and habits necessary to function successfully in the community. He can work. He can learn. He can maintain longstanding relationships. He can participate constructively in organizations and communities. Those capacities will still exist when the incarceration portion of his sentence ends.

*E. Josh's personal history is not marked by substance abuse, instability, or a pattern of failed relationships.*

It is also important to note the significant things absent from Josh's history. He has no history of illegal drug use and reports drinking only ever minimally. His life before this case was not characterized by addiction or chronic substance abuse. Nor does Josh have a history of moving from relationship to relationship. He was never someone who had a long succession of girlfriends or casual romantic relationships. His personal life was comparatively limited in that respect. He eventually began a relationship with Aubrey Pack, and after approximately two years together they married in September 2024. They have no children.

*F. The support surrounding Josh is real, broad, and will remain available after sentencing.*

Perhaps the most compelling feature of Josh's personal history is the sheer number of people who remain invested in what happens to him next. Family support at sentencing is sometimes described abstractly. Here, it is tangible. His parents remain closely involved in his life. His sisters and extended family remain supportive. His church community remains engaged. Lifelong friends, former teachers, coaches, teammates, employers, community leaders, and people whose children Josh coached have taken the time to tell the Court that they intend to continue supporting him.



Some of those writers expressly acknowledge that supporting Josh does not require condoning his conduct. Kaylee Lockwood, who has known him for approximately ten years, specifically tells the Court that she does not condone the actions that led to the charges but nevertheless believes that Josh has the ability to learn from his mistakes and use the experience as an opportunity for personal growth. His aunt similarly emphasizes accountability and respect for the judicial process while maintaining her belief in the character she has observed throughout his life.

His pastor's letter is particularly important in this respect. Jason Krohn has known Josh for more than seven years through church and describes a man who has remained engaged with his faith community during this extraordinarily difficult period. He does not portray Josh as blameless.

Instead, he describes Josh as acknowledging the consequences of his actions, expressing remorse, and recognizing the hurt caused to himself and others. At the same time, Pastor Krohn remains convinced that Josh's family, faith, friendships, and inherent capacity for growth give him a meaningful future. Josh Bolin is responsible for the conduct that brings him before this Court. But he is not only that conduct**.**

## III. NATURE AND CIRCUMSTANCES OF THE OFFENSE.

This is not a case involving a large collection of child pornography amassed over an extended period of time. The number of images at issue was minimal. Nor did Mr. Bolin search the internet for images of unknown children, participate in child-pornography trading communities, purchase material, distribute images to others, or accumulate thousands of files depicting numerous victims. Instead, the images at issue arose in the context of his communications with one seventeen-year-old young woman whom he knew personally. She created the images herself and voluntarily sent them to Mr. Bolin. Those facts do not make his receipt or possession of the images lawful. They do, however, matter in assessing the actual nature and relative seriousness of his conduct.

Her age likewise must be addressed carefully but candidly. She was a minor under federal law, and the defense does not suggest that being seventeen (17) changes that legal status. It does not. At the same time, she was seventeen and months away from turning eighteen. The Court's obligation to consider the circumstances of the particular offense permits recognition of that fact without minimizing the protections afforded to minors. There is a meaningful factual distinction between this case and one involving prepubescent children, very young adolescents, or images depicting children with whom a defendant had no personal relationship. Recognizing that

distinction is not an argument that the conduct was permissible; it is an argument for proportionality in punishment.

The broader relationship between Mr. Bolin and the young woman requires even greater care because the parties fundamentally disagree about what occurred. The Government charged Mr. Bolin with additional conduct arising from that relationship, but that count will be dismissed as part of the resolution of this case should the Court accept the plea agreement. Mr. Bolin does not agree with the allegation that he coerced the minor into a sexual relationship or sexual conduct. His account is that the relationship and their interactions were voluntary. The defense recognizes, of course, that her age carries legal significance and does not ask the Court to resolve that disputed allegation by simply accepting Mr. Bolin's characterization. But neither should a disputed allegation contained in a count that will be dismissed silently become an established fact for purposes of determining the appropriate sentence. Where the parties' accounts diverge, that disagreement should remain clear.

There is also a very human dimension to these circumstances that can be acknowledged without shifting responsibility from Mr. Bolin. He was twenty-five years old, relatively inexperienced in romantic relationships, significantly overweight, and not someone who had spent his young adulthood receiving an abundance of romantic attention. He found himself receiving attention and affection from an attractive young woman, and he was flattered by it. He enjoyed it. None of that relieved him of the obligation to exercise appropriate judgment. He was the adult, and he should have exercised better judgment. But sentencing is ultimately an exercise in understanding how an individual defendant came to commit an offense, not simply identifying the statute that he violated. There is a difference between explaining conduct and excusing it.

That distinction is important here. The defense is not arguing that the young woman bears responsibility for Mr. Bolin's choices because she took the photographs or sent them voluntarily. Nor is the defense arguing that seventeen is the same as eighteen. The point is narrower: these facts describe the particular offense for which this particular defendant is being sentenced. The Court can recognize simultaneously that Mr. Bolin crossed a serious legal boundary and that the circumstances surrounding that violation are considerably different from the paradigmatic child-pornography case involving deliberate acquisition and collection of sexually exploitative material depicting numerous and often very young children.

Ultimately, Mr. Bolin accepts responsibility for the offense to which he pleaded guilty. He should have recognized the boundary that the law required him to observe, and he will experience substantial consequences because he failed to do so. But § 3553(a) demands proportionality as well as punishment. The limited number of images, the fact that they were self-produced and voluntarily sent by a seventeen-year-old whom Mr. Bolin personally knew, her proximity to adulthood, and the absence of the large-scale collecting, trading, or anonymous exploitation characteristic of more aggravated cases are legitimate circumstances for the Court to consider. Taken together with the other factors discussed throughout this memorandum, they support a sentence at the statutory minimum of sixty months as sufficient, but not greater than necessary, to address the offense before the Court.

## IV. THE SERIOUSNESS OF THE OFFENSE, RESPECT FOR THE LAW, JUST PUNISHMENT AND DETERRENCE.

The defense does not minimize the seriousness of an offense involving the receipt of child pornography. Congress has determined that receipt of child pornography warrants significant punishment, and the harm associated with the creation and circulation of such material is real. Mr. Bolin accepts that his conduct requires punishment and that a meaningful sentence is necessary to

reflect the seriousness of the offense and promote respect for the law. At the same time, § 3553(a) requires an individualized assessment of the actual conduct before the Court. The label attached to an offense identifies its nature but does not necessarily dictate its degree.

The particular circumstances here place Mr. Bolin's conduct toward the less aggravated end of the spectrum encompassed by the receipt statute. This was not a case involving an extensive collection accumulated over years, thousands of images involving unknown children, commercial trafficking, or the exchange of material among individuals sharing a sexual interest in children. The number of images at issue was minimal. Moreover, the images central to this case were sent voluntarily to Mr. Bolin by the seventeen-year-old depicted in them, at a time when she was only months from her eighteenth birthday. Those facts do not make the images lawful to receive, nor does the defense suggest that they do. They do, however, provide important context when determining the punishment warranted by this particular offense. There is a meaningful difference between acknowledging that conduct is criminal and serious and treating every violation of the receipt statute as equally aggravated.

The statutory mandatory minimum itself ensures that Mr. Bolin will receive substantial punishment. Regardless of the mitigating circumstances surrounding his conduct, he faces no less than sixty months in federal prison. Five years of incarceration is a profound deprivation of liberty for a twenty-seven-year-old man who has never before experienced a federal prison sentence. A sixty-month sentence cannot reasonably be characterized as inconsequential or as failing to communicate the seriousness with which federal law treats this conduct. It sends an unmistakable message to Mr. Bolin and others—that the receipt of sexually explicit images of a minor carries severe consequences.

And the punishment imposed in this case will not end when Mr. Bolin walks out of prison. He will leave federal custody as a convicted felon and will carry that status for the remainder of his life. He will be subject to sex-offender registration requirements and the substantial restrictions and public consequences that accompany registration. His conviction will affect where he can live, the opportunities available to him, and how others perceive him long after the custodial portion of his sentence has been completed. Perhaps particularly significant for Mr. Bolin, sports have been an important part of his life and identity. Whatever role youth athletics once played in his life, that chapter is over. He will never again coach or occupy the place in youth sports that he once did. Those are real and lasting consequences of his conduct.

These consequences are relevant not as substitutes for punishment, but as part of the Court's assessment of how much punishment is necessary. Section 3553(a) does not require the Court to impose the greatest punishment available; it requires a sentence that is "sufficient, but not greater than necessary" to accomplish the statutory purposes of sentencing. 18 U.S.C. § 3553(a). Here, the mandatory five-year term, followed by the enduring consequences of a federal felony conviction and sex-offender registration, provides substantial punishment and powerful specific deterrence. Nor is a sentence greater than the mandatory minimum necessary to provide general deterrence or promote respect for the law. Respect for the law is not measured solely by the length of a sentence. It is also promoted when punishment bears a rational relationship to the defendant's actual conduct and individual circumstances. The Court can recognize the categorical seriousness of child pornography while simultaneously recognizing that this particular case does not present the aggravating characteristics found in many receipt prosecutions. Doing so does not diminish the offense. It fulfills the individualized sentencing obligation Congress imposed through § 3553(a).

Mr. Bolin will pay an enormous price for his conduct. He will lose at least five years of his freedom during his twenties, carry a felony conviction for life, register as a sex offender, and permanently lose opportunities that were once meaningful parts of his life. A sentence of sixty months is serious punishment for serious conduct. Under the particular facts of this case, it is also sufficient to promote respect for the law, provide just punishment, and accomplish both specific and general deterrence without imposing a sentence greater than necessary.

## V. **<u>THE NEED FOR CORRECTIONAL TREATMENT AND PROTECTION OF THE PUBLIC FROM FURTHER CRIMES OF JOSHUA LEE BOLIN.</u>**

The need for correctional treatment in this case does not require an extended period of incarceration beyond that necessary to accomplish the other purposes of sentencing. Mr. Bolin has acknowledged mental-health needs that warrant continued attention. He reports experiencing anxiety since childhood and was diagnosed with anxiety and depression in 2024. Importantly, he has demonstrated a willingness to seek help rather than resist it. Prior to incarceration, he participated in weekly counseling, has taken prescribed medication, and later began meeting regularly with his pastor for support. He has expressed a desire to continue mental-health treatment. His pastor likewise describes a man who has confronted the consequences of his choices, expressed remorse, and remained engaged with a community prepared to support and hold him accountable. These circumstances suggest that continued treatment and structured support will be important to his successful reintegration.

The Court can address those needs through appropriate treatment and the structure of supervised release following his release from prison. Supervised release provides the Court and the United States Probation Office with the ability to require counseling and appropriate treatment, monitor compliance, restrict conduct when necessary, and intervene if concerns arise. Mr. Bolin

will not simply complete his custodial sentence and return to the community without oversight. The combination of treatment, supervision, and the strong family and faith-based support described elsewhere in this memorandum provides a meaningful framework for rehabilitation.

Those same safeguards are directly relevant to the need to protect the public. Mr. Bolin will also be subject to sex-offender registration and the restrictions associated with that status. Rather than repeat the collateral consequences discussed above, the significance here is functional. The registration, supervision, treatment, and appropriate restrictions provide continuing mechanisms for monitoring Mr. Bolin and reducing the opportunity for future misconduct. His future will look substantially different from his life before this prosecution, including the fact that he will no longer occupy positions involving youth athletics. The circumstances that once placed him in regular contact with young athletes will therefore not simply resume following his release.

Nothing in Mr. Bolin's background suggests that the only means of protecting the public is incapacitating him for a period substantially longer than the mandatory minimum. He has a stable family prepared to receive him, a faith community that has remained engaged, a demonstrated willingness to participate in treatment, and a structure of federal supervision and sex-offender requirements that will continue well beyond his release from custody. The Court can therefore protect the public while also recognizing that rehabilitation ultimately occurs in the community. A sentence of sixty months, coupled with appropriate treatment and meaningful supervision, is sufficient to address Mr. Bolin's correctional needs and protect the public without imposing incarceration greater than necessary to accomplish those purposes.

## VI. <u>THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES.</u>

The Court must also consider, as part of the "just punishment" determination, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). The Tenth Circuit emphasized that "[t]he need to avoid unwarranted disparities is a critical sentencing factor. Equal justice is a core goal of our constitutional system." *United States v. Lente*, 647 F. 3d 1021, 1039 (10th Cir. 2011) (vacating sentence for failure to address the disparate sentence issue).




The need to avoid unwarranted sentencing disparities likewise supports the requested sentence. The Sentencing Commission's Fiscal Year 2025 data for defendants sentenced under §2G2.2 (with the same criminal history category of I) shows that the single largest group—46.9% of defendants—received sentences between five and ten years, while another 14.5% received sentences between two and five years. Thus, a sentence of 60 months places Mr. Bolin squarely within the range in which the majority of defendants sentenced under this guideline are punished. It is not an outlier or an unusually lenient disposition.

That comparison is particularly meaningful here because Mr. Bolin's requested sentence is not the product of avoiding incarceration altogether. Sixty months is the statutory mandatory minimum and represents five years in federal prison. Considering the individualized mitigating circumstances discussed above, imposing that sentence would appropriately distinguish Mr. Bolin from more aggravated §2G2.2 offenders while remaining entirely consistent with the sentences actually imposed nationally. A 60-month sentence therefore satisfies § 3553(a)(6) without imposing punishment greater than necessary.

## VII. CONCLUSION.

This memorandum presents authority for the Court to exercise sentencing discretion within the statutory considerations of §3553(a). Respectfully, we submit that the Court should find that a sentence of sixty (60) months—the lowest end of the guidelines (with credit for time served), followed by a term of supervised release the Court believes is appropriate, is the way to ensure the statutory considerations are upheld and the punishment is not greater than necessary.

Respectfully Submitted,

Carla R. Stinnett

Carla R. Stinnett, OBA No. 19532
STINNETT LAW
12133 South Yukon Avenue, Suite No. 300
Glenpool, OK 74033
Telephone: (918) 227-1177
Facsimile: (918) 227-1197
Email: carla@stinnettlaw.com
***Attorney for Defendant Joshua Lee Bolin***

## CERTIFICATE OF SERVICE

I, Carla R. Stinnett, Esq., hereby certify that on the 28th day of August, 2026, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Jessie K. Pippin, Esq. – jessie.heidlage@usdoj.gov
Clay A. Compton, Esq. – clay.compton@usdoj.gov
*Attorney for United States of America*

Carla R. Stinnett

Carla R. Stinnett, Esq.
*Attorney for Defendant Joshua Lee Bolin*